UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

AMANDA BEILMAN,                          :
                                         :CIVIL ACTION NO. 3:16-CV-1156
          Plaintiff,                     :
                                         :(JUDGE CONABOY)
          v.                             :
                                         :
CAROLYN W. COLVIN,                       :
Acting Commissioner of                   :
Social Security,                         :
                                         :
          Defendant.                     :
                                         :

---

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). (Doc. 1.) She alleged disability beginning on September 26, 2011. (R. 15.) The Administrative Law Judge ("ALJ") who evaluated the claim, Michelle Wolfe, concluded in her August 28, 2014, decision that Plaintiff had the severe impairments of cervicalgia, lumbar facet syndrome, cervical and lumbar sprain, sacroliliitis, obesity, asthma traumatic brain injury with post-concussive syndrome, and cervicogenic headaches, as well as non-severe impairments including GERD, anxiety disorder, depressive disorder and carpal tunnel syndrome. (R. 17.) ALJ Wolfe found that these impairments did not meet or equal a listing when considered alone or in combination. (R. 19.) She also found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with certain nonexertional limitations and that she was capable of performing

jobs that existed in significant numbers in the national economy. (R. 19-30.)  ALJ Wolfe therefore found Plaintiff was not disabled from September 26, 2011, through the date of the decision.  (R. 31.)

In the "Statement of Errors Alleged," Plaintiff identifies two errors: 1) "the ALJ erred by concluding the Plaintiff did not have a severe medically determinable impairment or combination of impairments"; and 2) "the ALJ erred by concluding the Plaintiff's impairments did not meet or equal a listed impairment."  (Doc. 11 at 7.)  After careful review of the record and the parties' filings, the Court concludes this appeal is properly denied.

## I. Background

### A.   Procedural Background

Plaintiff protectively filed for DIB July 7, 2012.  (R. 15.) The claim was initially denied on February 6, 2013, and Plaintiff filed a request for a hearing before an ALJ on April 5, 2013. (*Id.*)

ALJ Wolfe held a hearing on May 20, 2014, in Harrisburg, Pennsylvania.  (*Id.*)  Plaintiff, who was represented by an attorney, appeared at the hearing as did Vocational Expert ("VE") Michelle Georgio.  (*Id.*)  As noted above, the ALJ issued her unfavorable decision on August 28, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 32.)

2

Plaintiff's request for review of the ALJ's decision was dated October 30, 2014.  (R. 7-11.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on April 19, 2016.  (R. 1-6.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On June 15, 2016, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on August 24, 2016.  (Docs. 9, 10.)  Plaintiff filed her supporting brief on October 11, 2016.  (Doc. 12.)  Defendant filed her brief on November 10, 2016.  (Doc. 13.)  Plaintiff did not file a reply brief and the time for doing so has passed.  Therefore, this matter is ripe for disposition.

## B.  *Factual Background*

Plaintiff was born on March 8, 1986, and was twenty-five years old on the alleged disability onset date.  (R. 30.)  She has a high school education and past relevant work as a diet clerk, a dispatcher, a resident aide, and a security guard.  (*Id.*)

## 1.  **Impairment Evidence**[1]

Plaintiff alleged disability beginning on September 26, 2011, due to cervical whiplash, lumbago, pinched nerves in her back, neck

---

[1] The Court focuses on the evidence cited by the parties which is supported by citation to the record and that relied upon by the ALJ.  Therefore, statements in Plaintiff's "Statement of the Case" which are unaccompanied by citation are not necessarily included in the Court's review of evidence.

injury, back injury, anxiety, erosive lichen planus, and depression.  (R. 134.)

Moses Taylor Hospital records from September 26, 2011, show that Plaintiff had a CT scan of the brain due to head and neck pain following a motor vehicle accident.  (R. 186.)  Clinical History indicates that Plaintiff was in a neck brace.  (*Id.*)  The Impression was "[n]o acute intracranial abnormality [and] [n]o skull fracture identified."  (*Id.*)  X-rays on the same date showed "straightening of the normal lordosis which may represent muscle spasm" and no evidence of fracture or subluxation.  (R. 187.) Plaintiff was advised to follow up if symptoms persisted.  (*Id.*) Cervical spine CT showed no acute bone abnormality and loss of normal cervical lordosis which could be secondary to muscle spasm. (R. 189.)

At the time, Plaintiff received primary care treatment at The Wright Center Medical Group.  (R. 240-48.)  At her September 23, 2011, appointment Plaintiff was seen by Alycia Coar, PA-C, and reported a two-day history of pain in her left calf, stating that it hurt when she walked and elevation had not provided relief.  (R. 240.)  Her medical problems included back pain from a 2005 work injury.  (R. 241.)  Other than the presenting problem, Plaintiff denied any other difficulties.  (*Id.*)  Examination showed full range of motion bilaterally in her upper and lower extremities and Plaintiff was sent to the ER and advised to call if the symptoms

4

worsened, persisted, or changed.  (R. 242.)

On September 28, 2011, Plaintiff was seen at the Wright Center by Jignesh Sheth, M.D., for complaints of neck and back pain related to the September 26, 2011, accident.  (R. 244.)  Plaintiff had full range of motion bilaterally in her upper and lower extremities, she was alert and oriented x3 and her affect was normal.  (R. 247.)  Dr. Sheth diagnosed asthma, tobacco use disorder, generalized anxiety disorder, Lichen Planus, cellulitis, and sleep disorder.  (R. 247.)  Office notes from the same date relate more specifically to Plaintiff's complaints related to the September 26, 2011, accident and dizziness is noted to be an additional presenting problem.  (R. 249-52.)  Plaintiff reported that she was in the passenger seat not wearing a seat belt when she was rear-ended by a pickup truck while in stopped traffic.  (R. 250-51.)  She remembers the impact and then being in the ambulance on her way to Moses Taylor Hospital where neck, chest and CT scan of her head were negative.  (*Id.*)  She was discharged without medications for pain.  (*Id.*)  Examination showed tenderness of the thoracic and lumbar parvertebral region bilaterally.  (R. 251.)  Neurological examination was normal.  (*Id.*)  Plaintiff was prescribed pain medication and referred to a chiropractor.  (*Id.*)  Other than presenting problems, the Review of Systems was negative.  (R. 246, 251.)

On October 19, 2011, Plaintiff was again seen by Dr. Sheth for

complaints related to her motor vehicle accident: neck, back and shoulder pain, headaches, and nausea and vomiting.  (R. 253.) Plaintiff reported that she was seeing a chiropractor and improved initially but was getting worse.  (R. 254.)  Other than presenting problems, the Review of Systems was negative.  (R. 258.) Examination showed tenderness of the thoracic and lumbar parvertebral region bilaterally and normal neurological findings. (R. 255.)  Dr. Sheth noted that he was awaiting approval for a MRI to assess Plaintiff's severe neck pain and made a neurology referral.  (R. 256.)

    At Plaintiff's November 14, 2011, visit to the Wright Center, Plaintiff reported to Nancy Greer, CRNP, that she was still in pain.  (R. 257.)  Examination showed that Plaintiff had neck stiffness and full range of motion of her upper extremities bilaterally.  (R. 258.)  Ms. Greer noted that Plaintiff had a CT scan which showed muscle spasm but it was difficult to ascertain on evaluation because Plaintiff was very obese.  (*Id.*)  Neurological examination was normal.  (*Id.*)  Ms. Greer noted that Plaintiff did not appear to be in any pain and she had noticeable full range of motion but palpable muscle tenderness.  (R. 259.)  The Review of Systems indicates that Plaintiff denied any problems.  (R. 260.) Ms. Greer recorded that Skelaxin would be tried for pain "for this visit only" and that Plaintiff was advised that she should continue with the chiropractor for non-medicine pain relief and she would

not be given a long-term narcotic--she "would need to have another plan." (R. 259.)  Regarding generalized anxiety disorder, office records indicate that Plaintiff was doing well on her current medications. (R. 262.)

Plaintiff followed up at the Wright Center on December 6, 2011, reporting that she was seeing a chiropractor (Dr. Yusavage) three times a week and she did not feel it was helping. (R. 264.) Plaintiff also reported that she now had pain starting between her shoulder blades and shooting to her left hip and "her legs go numb and she falls to the floor," and she has left leg tingling and numbness, especially if she is sitting for a while. (*Id.*)  In the Review of Systems, Plaintiff denied any problems other than the specific presenting complaints. (R. 265.)  Examination showed that Plaintiff had bilateral muscle spasm and tightness in her neck, and stiffness with palpation of lower paraspinal muscles, no spinal tenderness, pain with single leg raise on the left but not on the right, and equal strength in all extremities. (R. 265-66.)  Mr. Greer planned to check EMG/NCV of upper extremities and order an MRI of the lumbar spine. (R. 266.)  Plaintiff was advised that pain medications would be refilled until all testing was done. (R. 267.)

Plaintiff was seen at Regional Hospital of Scranton on December 12, 2011, with the chief complaint of thoracic back pain radiating down the left leg resulting from the motor vehicle

collision.  (R. 191.)  Vicodin, Skelaxin, Prednisone, and Klonopin were recorded to be her medications.  (*Id.*)  Though the Nurses Note is difficult to read it appears that Plaintiff refused Percocet and Toradol, she "threw objects in room," and she said she expected an MRI that night.  (R. 192.)  Physical examination showed tenderness in the left back thoracic and lumbar region.  (R. 194.)

Electrodiagnostic examination/consultation was performed on December 14, 2011, due to complaints of low back pain extending to the left hip along with left leg weakness and loss of grip strength in both hands.  (R. 196-97.)  The following history was provided:

> Approximately one and a half weeks ago, she developed electric pains extending from her left low back into her left hips and from her left inguinal region to her left knee. She has had numbness in the dorsum of her left foot and the left leg occasionally gave way.  She has also ad occasional numbness in her right hip.  On December 6, 2011, while eating she lost grip strength in both hands. She has longstanding difficulty opening tight bottles.  She has had no numbness or tingling in her hands and no neck pain.  She has a 10 year history of an autoimmune disorder.  She also was involved in an automobile accideent in which she was rear-end[ed] in September of 2011.

(R. 197.)  Examination showed the following:

> She was obese.  Deep tendon reflexes were absent in the biceps, triceps, quadriceps and Achilles tendons.  She had decreased sensation to pinprick in the dorsum of the left great toe and the left medial arch.  There was also decreased sensation to pinprick in the left medial calf. There was moderate weakness in the left anterior tibialis, quadriceps femoris, iliiopsoas and

8

> hamstrings.  Toe tapping was moderately
> decreased in the left and normal in the
> right.  She had no loss of sensation to
> pinprick in either upper extremity and there
> was no loss of strength in either upper
> extremity.

(*Id.*)  Clinical Interpretation showed "[a]n old or chronic mild left L3 radiculopathy was presented based upon mild motor unit loss and chronic motor unit changes of the left L3 distribution.  There was suspected involvement of the left L4 distribution.  Lumbar paraspinal involvement contained increased insertional irritability."  (R. 198.)

MRI of the lumbar spine on January 5, 2012, showed "normal lumbar spine" and a "2.8 X 3.7 centimeter left ovarian cyst" with a similar finding described on a 2005 study.  (R. 199.)

At her visit to the Wright Center on January 6, 2012, Plaintiff had the same complaints related to the accident as at her December 6, 2011, visit.  (R. 264, 268.)  Ms. Greer noted that the MRI of the lumbar spine was a normal study and the EMG study of the upper extremities showed mild nerve root irritation.  (R. 268.)  In the Review of Systems, Plaintiff denied problems other than those indicated above.  (R. 269.)  Physical examination was the same as in December.  (R. 265-66, 270.)  Plaintiff was advised that she had to try physical therapy as the Wright Center would not continue to provide narcotic pain medications.  (R. 270.)  Regarding generalized anxiety disorder, office records indicate that Plaintiff continued to do well on her current medications.  (R.

9

262.)

On February 16, 2012, Plaintiff presented to the Wright Center for a recheck for her return to work. (R. 276.) Plaintiff reported that she had been seeing the chiropractor and it had been helping but she fell on the stairs at home and said that "everything the therapy was helping is now injured again." (R. 276.) Plaintiff did not feel she could go back to work due to the recent fall. (*Id.*) Review of Systems indicated that Plaintiff denied problems other than left arm pain, back pain, limitations of movement, muscle pain and neck pain. (R. 277.) Examination showed mild neck soreness with palpation, left upper arm sore to palpation, and lower back muscles sore to palpation. (*Id.*) Ms. Greer noted that Plaintiff would need to be x-rayed again because of the fall and she should hold off on physical therapy until the x-rays were done. (*Id.*) She also noted that Plaintiff had a follow up appointment on March 9th and she would need to be off work until then. (R. 278.)

On February 23, 2012, Plaintiff presented for facial swelling with blistering on her lips. (R. 279.) Review of Systems shows that Plaintiff denied back pain, stiffness, or trouble walking, and denied anxiety, depression, or paranoia. (R. 280-81.) Examination showed problems with Plaintiff's lips, her neck was supple on inspection, and she had full range of motion bilaterally of upper and lower extremities. (R. 281.)

10

On March 13, 2012, Plaintiff presented for heartburn, anxiety, depression, and asthma and was seen by Dr. Sheth. (R. 283.)  She reported that her anxiety was of sudden onset following the motor vehicle accident, she was unaware of any aggravating factors, and it was not alleviated by anything. (*Id.*)  Regarding accident related problems, Plaintiff said she felt better compared to her previous visit, she was "improving and mostly well controlled," she was taking prescribed medications with no side effects, and she reported moderate upper and lower back aching pain that did not radiate. (R. 283.)  In the Review of Systems, Plaintiff reported ambulatory dysfunction, back pain, stiffness and spasms, and anxiety. (R. 285.)  Examination showed that the neck was symmetric and supple on inspection, facet pain of the thoracic and lumbar vertebra, moderate spasm on the paravertebral muscles, limited range of motion with discomfort but full range of motion bilaterally of upper and lower extremities, cooperative attitude, normal mood and affect, logical and coherent thought processes, and no thoughts of delusions, hallucinations, obsessions, preoccupations or somatic thoughts were elicited. (*Id.*)  Dr. Sheth noted that Plaintiff had worsening anxiety disorder symptoms and started her on Celexa. (R. 286.)  Regarding her accident symptoms, Dr. Sheth noted that Plaintiff was continuing PT/OT at Allied Services which she had been in for five weeks, she reported good progress, her pain was tolerable and worse at night, it was

11

relieved with Advil, and she still complained of headaches.  (R. 286.)  He recommended that she get a letter from Allied for release to work. (*Id.*)

On April 13, 2012, Dr. Sheth noted that Plaintiff continued to do well with physical therapy, she was feeling much better, and wanted to go back to work.  (R. 291.)  He noted "Correspondence: Return to Work," and commented that Plaintiff was in good general health and he would follow her annually.  (*Id.*)

On April 25, 2012, Plaintiff said she felt worse since her last visit, she was taking medication as prescribed and she had no side effects.  (R. 292.)  She reported that she went back to work and did sedentary work on the first day but, when she did full duty on the second day (involving bed changes and laundry) she started having neck and back pain after four hours, was vomiting from the pain, and has been worse since then.  (*Id.*)  Examination showed the neck was symmetric and supple on inspection, facet pain of the lumbar vertebra, moderate spasm on the paravertebral muscles, limited ranges of motion with discomfort, full range of motion of the upper and lower extremities bilaterally, and normal mood, affect and thought processes.  (R. 293-94.)  Dr. Sheth noted a referral to Advanced Pain Management Specialists and the chiropractor, Dr. Yusavage.  (*Id.*)  Dr. Sheth also advised aqua therapy and he noted that Plaintiff would consider these options. (*Id.*)

12

On May 5, 2012, Pravin Patel, M.D., of Advanced Pain Management Specialists, conducted an initial evaluation of Plaintiff. (R. 202.)  Plaintiff's chief complaints were pain in the neck with muscle spasms and headaches, and low back pain, more on the left side radiating down the left leg, with numbness in the left leg. (R. 202.)  At the time, Plaintiff was taking only Albuterol as needed for asthma. (*Id.*)  Physical examination showed that Plaintiff was alert, awake and oriented times three, excruciating tenderness with muscle spasms of both paracervical muscles, right more than left, bilateral trapezoids and rhomboids. (R. 204.)  Active and passive range of motion was complete but painful with slight restrictions in extension and flexion. (*Id.*)  Motor function of the upper extremities was 5/5, there was no paresthesia, and no pain in the upper extremities. (*Id.*)  There was also tenderness along the lumbar facet joints, L4-L5 and L5-S1 with excruciating tenderenss of both sacroiliac joins and Patrick's and Gillette's signs positive bilaterally. (*Id.*)  Active and passive range of motion was restricted especially in extension, flexion and lateral flexion. (*Id.*)  Straight leg raising test was positive on the left side at forty-five degrees and negative on the right side. (*Id.*)  Plaintiff's gait was normal. (*Id.*)  Dr. Patel diagnosed cervicalgia, neck pain with muscle spasms, low back pain, bilateral lumbar facet syndrome, and bilateral sacroiliac joint pain and sacroilitis. (R. 205.)  He opined that the pain was

related to injuries she sustained in the September 2011 accident and he planned to give her a series of injections, trigger point release, moist heat compresses, stretching exercises, and over-the-counter NSAID pain relievers.  (*Id.*)

On May 11, 2012, Dr. Sheth noted that Plaintiff said she was following up with pain management and her pain was 10/10 which was hindering her from sleeping and was associated with vomiting.  (R. 296.)  He also recorded that Plaintiff presented with anxiety and new onset of not remembering ordinary and familiar things.  (*Id.*) In the Review of Systems, Plaintiff reported back pain, neck pain and stiffness, she denied trouble walking, and she reported some anxiety and frustration.  (R. 297.)  Examination showed that her neck was supple on inspection, and she had a full range of motion bilaterally of her upper and lower extremities.  (R. 298.) Plaintiff had a lumbar back brace and continued to express that she was going to think about Dr. Sheth's referrals for physical therapy, aqua therapy, and chiropractor services.  (R. 298.)  Dr. Sheth noted that Plaintiff's anxiety was mostly controlled and he advised her to exercise to control stress.  (*Id.*)  He also noted that he would start Remeron.  (*Id.*)  Regarding memory loss, Dr. Sheth commented it was "mostly pseudodementia from anxiety and depression."  (R. 299.)

Plaintiff received the injections recommended by Dr. Patel and reported "remarkable improvement" as of June 20, 2012.  (R. 210.)

14

Dr. Patel recorded that Plaintiff was getting fewer muscle spasms and was not in as much pain as she had been. (R. 211.) He advised continuing with the treatment. (*Id.*) Dr. Patel noted continuing improvement on July 2, 2012, and again recommended continuation of the course of treatment. (R. 209.)

On July 16, 2012, Plaintiff was seen at the Wright Center for injury related to a fall that day. (R. 300.) Plaintiff said her legs went numb when she was walking down the stairs and she fell. (*Id.*) As a result, she had pain and swelling in her right foot and pain just above her right knee. (*Id.*) Plaintiff reported that Dr. Patel's pain management treatment had not been helpful. (*Id.*) Examination showed that Plaintiff had full active flexion with pain and full active extension without pain, anterior and posterior draw tests were negative in the right knee, right valgus test at full extension was negative, Plaintiff had pain with right varus stress test at full extension, dorsiflexion and plantarflexion of the right foot illicited pain above the knee, movement of the right great toe illicited pain in the dorsum of the foot, and Plaintiff's attitude was cooperative with normal mood. (R. 301-02.) Plaintiff was given a prescription for Neurontin and Meloxicam, and x-rays of the foot, knee and femur were ordered. (R. 302.)

At her July 26, 2012, follow-up examination with Dr. Patel, he recorded that Plaintiff had been doing well (claiming she had reached 60% relief) but a week earlier she had weakness in her

15

lower extremities and fell which aggravated her low back pain.  (R. 206.)  Plaintiff was taking Flexeril and Tylenol with Codeine for pain and using alternating heat and ice compresses.  (*Id.*) Although Plaintiff reported excruciating pain in the low back and hip areas with muscle spasms, examination showed minimal muscle spasms of the paravertebral muscles, some tenderness of the bilateral lumbar facet joints and sacroiliac joints, but not as severe as noted before the injections.  (*Id.*)  Examination also showed that active and passive range of motion was slightly restricted in extension, flexion, and lateral flexion, straight leg raising test was negative, reflexes were symmetrical 2+ bilaterally, motor function was 5/5 in both lower extremities, and Plaintiff's gait was normal.  (*Id.*)  Dr. Patel recommended that Plaintiff start aqua therapy, discontinue Flexeril and Tylenol with Codeine, start Norflex and Cymbalta, continue using TENS unit regularly, and avoid injury or fall.  (R. 207.)

At her August 13, 2012, Wright Center visit, Plaintiff reported that her neck pain and back pain had been worsening since her last visit and she was taking medications prescribed by Dr. Patel without improvement.  (R. 303.)  She reported headaches and vomiting associated with the neck pain and said the pain was aggravated by lying down and minimally improved with ibuprofen. (*Id.*)  She said the lower back pain was moderately alleviated by ibuprofen and muscle relaxants and the symptoms disturbed her

16

sleep.  (*Id.*)   In the Review of Systems, Plaintiff reported back
and neck pain but denied a history of falls, muscle pain and
weakness, and she denied anxiety, depression and mood changes.  (R.
305.)   Examination showed that her neck was symmetric and supple on
inspection, she had full range of motion bilaterally of her upper
and lower extremities, and she was alert and oriented x3, with
normal affect and coordination.  (R. 305.)   Plaintiff was again
referred to Advanced Pain Management Specialists for the
cervicalgia, and she continued to think about the options Dr. Sheth
had previously presentd to address her lumbagao.  (R. 306.)

On September 5, 2012, Plaintiff was seen by Sheryl Oleski,
D.O., of Northeastern Rehabilitation Associates.  (R. 319-28.)
Plaintiff told Dr. Oleski that, since the accident, she had neck
and back pain with pins and needles intermittently into the right
hand as well as pins and needles into the legs, chronic headaches,
trouble with memory and word findings, some balance issues and
ringing in her ears.  (R. 319.)   Plaintiff said that her treatments
with Dr. Patel and with chiropractor Dr. Jason Yusavage had not
been helpful, and medications--including Tramadol, Skelaxin,
Orphenadrine, Diclofenac, Naproxen, Ibuprofen, Flexeril, and
Vicodin--either did not help or only slightly took the edge off her
pain .  (*Id.*)   Plaintiff rated her pain at 9/10 at the time of the
visit and said that it generally ranged from 7-10/10.  (*Id.*)   She
described the pain as aching, stabbing neck pain, intermittent

17

tingling that radiates into the right thumb, difficulty on occasion
with grip strength, she denied aching, stabbing, burning back pain
but did complain of intermittent numbness and tingling into her
legs that was worse when standing or walking, and the pain was
worse when getting up from a sitting position, walking, bending,
standing, coughing, and sneezing, lying on her back and lying on
her stomach.  (R. 391-20.)  Plaintiff said the pain was a little
better with sitting.  (R. 320.)  Plaintiff said she was not working
and a Functional Capacity Evaluation conducted at John Heinz
indicated she was not capable of returning to work at the time.
(*Id.*)  Physical evaluation showed that Plaintiff did not
demonstrate any overt pain behavior, she had a normal reciprocal
gait pattern, was able to toe and heel walk, she had a full
cervical range of motion, there was painful arc with the left
shoulder range, lumbar range of motion was limited by 50% and 25%
in extension, hip and knee range of motion were full but hip range
of motion caused increased back pain, strength testing was 5/5,
muscle strength reflexes were 2+ and symmetric, straight leg raise
test was mildly aggravated on the right but negative on the left,
sacroiliac joint provocation maneuvers were acutely aggravating on
the right and essentially negative on the left, and a lot of lumbar
muscle spasm was present as was diffuse cervical muscle spasm.  (R.
321.)  Dr. Oleski diagnosed cervical sprain consistent with
whiplash injury, lumbar sprain, sacroiliitis with suspected right

18

sacral disorder, and traumatic brain injury with post concussive syndrome and associated myofascial pain. (*Id.*)  She opined that Plaintiff was not capable of working at the time and an "out of work note" was provided. (R. 322.)

At her October 15, 2012, visit to the Wright Center, Plaintiff reported that her neck pain had been improving since her last visit and her lower back pain remained the same. (R. 308.)  She rated the back pain as 8/10 in severity and stated that it was moderately alleviated by ibuprofen and muscle relaxants. (*Id.*)  Plaintiff added that the symptoms disturbed her sleep and she also complained of numbness in both legs. (*Id.*)  Examination showed tenderness at the lumbosacral segments bilaterally and tenderness of the spine, normal mood, anxious affect appropriate to mood, and coherent, logical thought processes. (R. 310.)  Dr. Sheth commented that Plaintiff went to the chiropractor, physical therapy, and aqua therapy but nothing really helped her. (*Id.*)  He added that she had used narcotics in the past but was on ibuprofen which was helping along with flexeril. (*Id.*)  Dr. Sheth also commented that Plaintiff's neck pain was well controlled and she was no longer using the collar, and her anxiety disorder was mostly controlled. (R. 311.)

On October 18, 2012, Plaintiff was seen for nausea/dizziness and vomiting at the Wright Center. (R. 313.)  Plaintiff also presented with  back pain and neck pain as well as anxiety,

reporting that she was feeling more anxious and agitated about her health problems including concern that something was going wrong neurologically. (R. 313, 315.) Examination showed full range of motion bilaterally of upper and lower extremities, and worsening mood since prior visit with angry affect. (*Id.*) Physical therapy, aqua therapy, and chiropractor services were again recommended for back pain, lamictal was started for anxiety, and the nausea and vomiting was noted to possibly be related to food poisoning. (R. 316.)

Plaintiff returned to Dr. Oleski on November 8, 2012, continuing to complain of low back pain with pins and needles into her legs and worsening neck pain with headaches, including migraine headaches, and intermittent dizziness. (R. 331.) Dr. Oleski found a limited cervical range of motion, cervical muscle spasm, tenderness to palpation of the C2-3 facet joints, and otherwise normal physical examination. (*Id.*) Dr. Oleski planned neuropsychological testing for early December and recommended a neurological consultation regarding her headaches and dizziness. (R. 332.) Plaintiff was to continue her home exercise program and medication regimen, and Dr. Oleski also noted that Plaintiff would remain out of work due to her "present condition" and would be seen again in January after the recommended work up was complete. (*Id.*)

Dr. Oleski saw Plaintiff again on November 30, 2012, because Plaintiff was "having acute exacerbation and muscle spasm." (R.

20

333.)  She noted that Plaintiff was moving very stiffly and appeared to be in discomfort, with significant muscle spasm seen in the cervical and periscapular girdle as well as across the lumbosacral junction.  (*Id.*)  Dr. Oleski recommended a medication regimen to break the spasm, she administered a Toradol injection to attempt to alleviate Plaintiff's pain, and also recommended a trial of trigger point injections to which Plaintiff consented.  (R. 333-34.)

Plaintiff began treating with Kenneth A. Sebastianelli, M.D., of Primed, on December 6, 2012.  (R. 338.)  History notes indicate that Plaintiff reported neck and back pain since her accident in September 2011, she had been following with pain management, had tried physical therapy, aqua therapy and epidural injections without relief, she was frustrated because nothing seemed to help her pain, she was taking heavy doses of pain medications and muscle relaxants, and she had a history of lichen planus with no lesions at the time.  (*Id.*)  Review of Systems indicates that Plaintiff had the musculoskeletal problems identified in the history, she had no depressive thoughts, and she had no headaches, dizziness, imbalance, arm or leg weakness.  (R. 339.)  Exam showed the following: her neck was supple; she had cervical spine and lumbar tenderness with palpation, positive Spurling's sign, positive straight leg test in both legs when elevated forty to eighty degrees, and hand grasp strength 3/5 in both hands; and she was

oriented times three with no focality.  (R. 339.)  Dr.
Sebastianelli planned for Plaintiff to continue with pain
management and set her up with a neurology appointment.  (*Id.*)

On Dr. Sebastianelli's consultation, Plaintiff was seen by
Ralf van der Sluis, M.D., at Scranton Neurological Associates on
January 2, 2013, for evaluation of her headaches.  (R. 352.)  Exam
findings included that Plaintiff appeared to be in a mild degree of
chronic pain and discomfort, she had no neck stiffness, Adson sign
was positive on the left causing paresthesia down the entire arm
and positive on the right causing paresthesia in the biceps area,
mood was mildly depressed, and her affect was mildly constricted.
(R. 354.)  Dr. van der Sluis adjusted Plaintiff's medication
regimen, planned to do a workup for intracranial etiology, and
suggested additional physical therapy and blood work.  (R. 355.)

On January 7, 2013, Dr. Oleski recommended physical therapy
two to three times per week for four weeks and a return visit in
two months.  (R. 373.)

In a Medical Source Statement of Ability to Do Work-Related
Actvities (Physical) dated January 15, 2013, Dr. van der Sluis did
not complete any of the eight sections of the form, marking each
page "N/A."  (R. 346-51.)  On the last page of the form he stated
"patient has posttraumatic headaches and a postconcussion syndrome.
She cannot work until 3/13/2013.")  (R. 351.)

On January 18, 2013, Dr. van der Sluis did a nerve conduction

22

study because of numbness and tingling in both arms and hands.  (R. 358-61.)  The study was normal "without evidence of a nerve entrapment, a polyneuropathy, or radiculopathy.  There was no EMG-evidence of active denervation or chronic reinnervation."  (R. 360.)

On January 24, 2013, Dr. Sebastianelli noted that Plaintiff presented with the same symptoms as at her first visit.  (R. 394.) He also noted that Plaintiff said she has a lack of concentration at times, her neck hurts at times, and she was told that she had carpal tunnel syndrome after she had the nerve testing.  (*Id.*) Review of Systems indicates no joint pain or stiffness, back pain or paresthesias, no depressive thoughts, and no headaches, dizziness, imbalance, arm or leg weakness.  (R. 395.)  Examination findings include the following: Plaintiff was tearful at times; her neck was supple; she had some paracervical muscle tenderness in her neck and no problem in her extremities; and she was oriented times three with no focality.  (*Id.*)  Regarding Plaintiff's backache, Dr. Sebastianell commented "[t]here is some component of anxiety and possibly even some depression.  We tried Cymbalta in the past which did not help.  We will start Fluoxetine 20 mg daily.  She is going to continue the Ibuprofen and the Flexeril."  (*Id.*)  Regarding anxiety, Dr. Sebastianelli commented that alternative medicines like acupuncture may help and he thought a sleep study may be warranted.  (*Id.*)

23

On February 22, 2013, Plaintiff saw Lindsey Sorber, PA-C, of Dr. Oleski's office and reported that her pain was getting worse, she had constant daily headaches and multiple symptoms related to her head and neck complaints. (R. 409.)  Examination showed that Plaintiff had a limited cervical range of motion, with 25% of full side bending, 75% of full rotation and functional flexion and extension, she had functional shoulder range of motion and normal range of motion in the arms, she had normal strength but significant amount of cervical and periscapular spasm, and she had tenderness along the occipatal notch. (R. 410.)  Dr. Oleski planned to adjust Plaintiff's medication regimen and pursue MRIs of the cervical spine and brain and a neurological consultation. (*Id.*)

The March 5, 2013, MRI of the brain was negative. (R. 404.) The March 7, 2013, cervical spine MRI showed mild spondylosis, a disc bulge at C5-6 with suggestion of a small superimposed disc protrusion, no evidence of central canal stenosis, mild reversal of normal lordosis, and mild ectopia of the cerebellar tonsils. (R. 405.)

On March 12, 2013, Dr. Oleski noted that Plaintiff did not improve on the adjusted medication regimen, she continued with persistent neck pain and headaches with headaches the most severe, she still had low back pain. (R. 412.)  She rated her pain at 10/10. (*Id.*)  Plaintiff again complained of 10/10 pain in April

2013 but she had full range of motion of the cervical spine, noting pain with range of motion throughout all planes and pain to palpation of the cervical paraspinal muscles and upper trapezius muscles, and she had a normal neurologic examination of the bilateral upper extremities.  (R. 415.)

At her visit with Dr. Sebastianelli on March 20, 2013, Plaintiff was tearful and reported that her mouth ulcers had been unbearable--she was unable to eat or drink anything and she wanted to go back on steroids.  (R. 397.)  Examination showed ulcers on Plaintiff's lips and in her mouth.  (R. 398.)

On May 31, 2013, Plaintiff again told Dr. Oleski that her pain was 10/10 and the medication prescribed by the neurologist had not helped.  (R. 417.)  Plaintiff complained

> of severe aching pain affecting the head, neck, arms, back as well as her left leg. . . . She states the pain limits her ability to stand and walk more than sit.  The pain interferes with sleep.  She describes the pain as aching, burning and stabbing.  She states it is there all the time.  There are no remitting factors.

(R. 417.)  Examination showed several trigger points present in the cervical and periscapular girdle and a lot of tenderness to palpation surrounding the lower lumbar lateral masses with positive lumbar facet loading maneuvers.  (R. 418.)  In her "Plan," Dr. Oleski noted that Plaintiff was "in agony" and she recommended a trial of Methadone.  (*Id.*)  Dr. Oleski made other medication adjustments and noted that Plaintiff should continue to follow

closely with her neurologist. (*Id.*) She also administered trigger point injections. (*Id.*) In June Plaintiff reported that her pain was unchanged compared to her last visit, but she also said that the Methadone helped some and she stopped taking the morning does because it was too sedating. (R. 420.)

On July 22, 2013, Plaintiff reported to Brant Adomiak, CRNP, of Dr. Sebastianelli's office that she had been in another accident on July 18, 2013. (R. 400.) Plaintiff was not wearing a seat belt and said her body went side to side when she was hit. (*Id.*) She did not go to the ER but since the accident she said she had been experiencing headaches--feeling like a rubber band was around her head, had ringing in her ears, and she felt off balance and experienced some neck pain as well as numbness at the digits on her right hand. (*Id.*) Dr. Sebastianelli also noted that Plaintiff's March 7, 2013, MRI showed a disc bluge at C5-C6. (*Id.*) Examination showed tenderness along the cervical spine and decreased range of motion in the neck, 4/5 hand grasp strength in both hands, and decreased pin prick sensation at the digits of the right hand. (R. 401.) Dr. Sebastianelli adjusted Plaintiff's medication regimen and was directed to do neck exercises at home and follow up with the neurologist as scheduled. (*Id.*)

On August 5, 2013, Plaintiff saw Dr. Oleski and reported worsening pain located diffusely throughout her head, neck, low back, left arm and left leg. (R. 424-25.) She rated the pain as

10/10 and said it interfered with her ability to sleep.  (R. 425.)
She had been given Percocet by her primary care provider following
the July accident and stopped taking Methadone five days before her
August 5th office visit because she ran out of it and said it had
not helped.  (R. 424.)  Examination showed that Plaintiff was alert
and oriented, she had normal mood and gait, and she was tender to
palpation throughout.  (R. 425.)  Plaintiff was reminded of her
medication agreement that she should not receive any pain
medications from any other doctor and was reminded to get the blood
work previously ordered.  (*Id.*)  Plaintiff was not interested in a
formal course of physical therapy or pursuing any injections.
(*Id.*)

At the request of Dr. Sebastianelli, Plaintiff saw Timothy
Bundy, D.O., of Northeaster Rehabilitation Associates, P.C., on
September 23, 2013, for follow up regarding her upper and lower
back pain as well as diffuse pain.  (R. 427.)  She again reported
worsening pain.  (*Id.*)  He recommended that Plaintiff gradually be
titrated off all opioids and that they be discontinued completely
because of lack of significant benefit.  (R. 428.)  Dr. Bundy
started Plaintiff on Lyrica and discussed with her the importance
of regular physical activity and beginning an exercise program such
as walking.  (*Id.*)

The September 27, 2013, x-rays of the left wrist and elbow
showed no acute abnormality.  (R. 406, 407.)

27

At her Northeastern Rehabilitation visit on October 22, 2013, Plaintiff was seen by Katherine Worsnick, PA-C.  (R. 430-31.) Plaintiff continued to complain of 10/10 diffuse pain and reported she was unable to start Lyrica because her insurance company found she did not meet the diagnostic criteria.  (R. 430.)  Examination showed that Plaintiff was alert, her mood was appropriate, and she had a reciprocal gait patten.  (R. 431.)  Plaintiff was not interested in pursuing injections, aquatic or physical therapy, or chiropractic treatment but wanted to return to rheumatology.  (*Id.*)

In November, Plaintiff reported to Dr. Oleski that her pain was unchanged.  (R. 432.)  Dr. Oleski provided a sample of Lyrica and indicated she would try to get it covered by the insurance company.  (*Id.*)

On February 4, 2014, Plaintiff reported to Dr. Oleski that she had some temporary (5 hour) benefit with Oxycontin but Lyrica was not helpful.  (R. 434.)  She said her pain was so bad that she was unable to walk and she rated her pain as 10+.  (*Id.*)  Examination showed that Plaintiff had a reciprocal gait with a forward truncal lean, she was using a walker, she had diffuse tenderness to palpation just about everywhere, she had some cervical paraspinal muscle spasm present, straight leg raise test was negative, sensation was grossly intact to light touch, and there was no evidence of atrophy or fasciculations.  (R. 435.)  Dr. Oleski continued to diagnose diffuse myofascial pain syndrome, chronic

28

cervical and lumbar sprain, associated post concussive syndrome, and a history of headaches. (*Id.*) Dr. Oleski recommended that Plaintiff follow through with the sleep study that had been recommended by neurology and noted that the lack of sleep or sleep apnea could be contributing to increased pain levels and headaches. (*Id.*) Plaintiff requested, and was given, some trigger point injections and was directed to follow up with rheumatology and neurology. (*Id.*)

Plaintiff had a rheumatology consultation with Chad Walker, D.O., on February 13, 2014. (R. 437.) Examination showed the following: normal muscle tone in the upper and lower extremities; symmetric deep tendon reflexes diminished bilaterally; diffusely tender to palpation with any range of motion testing; and 18/18 fibromyalgia tenderpoints. (R. 438.) Dr. Walker noted that Plaintiff clearly had fibromyalgia features and she had been tried on all the fibromyalgia medications that he normally recommended with the exception of Gralise and Savella. (R. 439.) He gave her a sample of Gralise. (*Id.*)

On March 27, 2014, Plaintiff returned to Dr. Sebastianelli complaining of depression, congestion, and a flare up of her planus lichen. (R. 470.) On examination, Dr. Sebastianelli found that both nare were inflamed and red and Plaintiff had generalized tenderness at all joints. (R. 471.)

Plaintiff again saw Dr. Oleski on April 28, 2014, and reported

that she was "substantially worse" than when last seen.  (R. 478.)
Plaintiff received trigger point injections and Dr. Oleski adjusted
pain medications.  (R. 478-79.)

**2.   Opinion Evidence**

On January 15, 2013, the state agency medical consultant,
David Hutz, M.D., opined that Plaintiff could lift twenty pounds
occasionally and ten pounds frequently, she could walk for about
six hours in an eight-hour day and sit for the same amount of time.
(R. 70.)  He also concluded that she could occasionally climb ramps
and stairs, balance, stoop, crouch and crawl but she could never
climb ladders, ropes or scaffolds, and she should avoid
concentrated exposure to extreme cold, wetness, vibration, fumes
and odors, and hazards.   (R. 71.)

On April 13, 2012, Dr. Sheth noted the Plaintiff wanted to go
back to work and indicated "Correspondence: Return to Work,"
commenting that Plaintiff was in good general health and he would
follow her annually.  (R. 291.)

On September 5, 2012, Dr. Oleski opined that Plaintiff was not
capable of working at the time and an "out of work note" was
provided.  (R. 322.)

On January 15, 2013, Dr. van der Sluis stated that Plaintiff
had "patient has posttraumatic headaches and a postconcussion
syndrome.  She cannot work until 3/13/2013."  (R. 351.)

On January 17, 2013, the state agency psychological

30

consultant, Dennis Gold, Ph. D., concluded that Plaintiff did not have a medically determinable mental impairment.  (R. 69.)

On April 17, 2014, Dr. Sebastianelli directed correspondence "To Whom It May Concern," stating that Plaintiff "reported problems with her memory after her motor vehicle accident in 2011.  The memory problems were compounded by the pain medications she was taking."  (R. 441.)

On May 20, 2014, Dr. Sebastianelli directed correspondence to Plaintiff's attorney.  (R. 484.)

> Amanda Beilman has been under my care since 12/6/12.  As previously documented in her records, she has multiple medical problems stemming from her motor vehicle accident of 12/6/11.  She suffers from diffuse, chronic pain involving her neck, mid and lower back as well as her arms and legs.  She has seen multiple physicians, and has been extensively treated with a wide variety of medications and therapies.  Despite this, she remains quite symptomatic.
>
> I feel that within a reasonable degree of medical certainty, she is medically disabled from obtaining meaningful employment.  I feel this is permanent.  I have provided copies of her extensive past records.

(R. 484.)

## 3.   **ALJ Decision**

As noted above, ALJ Wolfe issued her Decision on August 28, 2014.  (R. 15-31.)  She made the following Findings of Fact and Conclusions of Law:

> 1.   The claimant meets the insured status

31

requirements of the Social Security Act
through March 31, 2017.

2.   The claimant has not engaged in
     substantial gainful activity since
     September 26, 2011, the alleged onset
     date (20 CFR 404.1571 et seq.).

3.   The claimant has the following severe
     impairments: cervicalgia, lumbar facet
     syndrome, cervical and lumbar sprain,
     sacroiliitis, obesity, asthma, traumatic
     brain injury with post-concussive
     syndrome, and cervicogenic headaches (20
     CFR 404.1520(c)).

4.   The claimant does not have an impairment
     or combination of impairments that meets
     or medically equals the severity of one
     of the listed impairments in 20 CFR Part
     404, Subpart P, Appendix 1 (20 CFR
     404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the
     entire record, the undersigned finds
     that the claimant has the residual
     functional capacity to perform sedentary
     work as defined in 20 CFR 404.1567(a)
     except she can occasionally balance,
     stoop, crouch, crawl, kneel, and climb,
     but the claimant can never climb on
     ladders, ropes, or scaffolds.  The
     claimant must avoid concentrated
     exposure to temperature extremes of
     cold, wetness, vibrations, fumes, odors,
     dusts, gases, poor ventilation, loud
     excessive noise, and hazards including
     moving machinery and unprotected
     heights.  She can occasionally push/pull
     with the upper and lower extremities.
     The claimant cannot work on/with
     computers, screens, or monitors and she
     is limited to simple, routine tasks.

6.   The claimant is unable to perform any
     past relevant work (20 CFR 404.1565).

7.   The claimant was born on March 8, 1986

32

and was 25 years old, which is defined
as a younger individual age 18-44, on
the alleged disability date (20 CFR
404.1563).

8.   The claimant has at least a high school
education and is able to communicate in
English (20 CFR 404.1564).

9.   Transferability of job skills is not
material to the determination of
disability because using the Medical-
Vocational Rules as a framework supports
a finding that the claimant is "not
disabled," whether or not the claimant
has transferable job skills (See SSR 82-
41 and 20 CFR Part 404, Subpart P,
Appendix 2).

10.   Considering the claimant's age,
education, work experience, and residual
functional capacity, there are jobs that
exist in significant numbers in the
national economy that the claimant can
perform (20 CFR 404.1569 and
404.1569(a)).

11.   The claimant has not been under a
disability, as defined in the Social
Security Act, from September 26, 2011,
through the date of this decision (20
CFR 404.1520(g)).

(R. 17-31.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[2]  It is necessary for the

---

[2]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

---

disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs which existed in significant numbers in the national economy.  (R. 30-31.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make

35

> clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court

36

can determine whether the reasons for rejection were improper."
*Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an
exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v.
Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement
that the ALJ discuss in its opinion every tidbit of evidence
included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d
Cir. 2004).  "[W]here [a reviewing court] can determine that there
is substantial evidence supporting the Commissioner's decision, . .
. the *Cotter* doctrine is not implicated." *Hernandez v. Comm'f of
Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not
precedential).

A reviewing court may not set aside the Commissioner's final
decision if it is supported by substantial evidence, even if the
court would have reached different factual conclusions. *Hartranft*,
181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d
1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings
of the Commissioner of Social Security as to any fact, if supported
by substantial evidence, shall be conclusive . . .").  "However,
even if the Secretary's factual findings are supported by
substantial evidence, [a court] may review whether the Secretary,
in making his findings, applied the correct legal standards to the
facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d
Cir. 1983) (internal quotation omitted).  Where the ALJ's decision
is explained in sufficient detail to allow meaningful judicial

review and the decision is supported by substantial evidence, a
claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Comm'r
of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not
precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d
Cir. 2000) ("[O]ur primary concern has always been the ability to
conduct meaningful judicial review.").  An ALJ's decision can only
be reviewed by a court based on the evidence that was before the
ALJ at the time he or she made his or her decision.  *Matthews v.
Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

### IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision
should be reversed or remanded for the following reasons: 1) "the
ALJ erred by concluding the Plaintiff did not have a severe
medically determinable impairment or combination of impairments";
and 2) "the ALJ erred by concluding the Plaintiff's impairments did
not meet or equal a listed impairment."  (Doc. 11 at 7.)

Plaintiff's first claimed error relates to step two of the
sequential evaluation process where the determination is made
whether Plaintiff has a severe impairment or combination of
impairments.  20 C.F.R. 404.1520(c).  Plaintiff's statement that
the ALJ erred by concluding she did not have a severe impairment or
combination of impairments is fundamentally flawed because the ALJ
did find that Plaintiff had several severe impairments:
cervicalgia, lumbar facet syndrome, cervical and lumbar sprain,

38

sacroiliitis, obesity, asthma, traumatic brain injury with post-concussive syndrome, and cervicogenic headaches.  (R. 17.)  To the extent Plaintiff intended to claim error based on the ALJ's finding that her medically determinable mental impairments of anxiety disorder and depressive disorder were not severe (*see* R. 18), Plaintiff has not satisfied her burden of showing error on this basis.  Plaintiff's conclusory statements related to her anxiety and its impact on her functioning (Doc. 11 at 11-12), whether considered in relation to step two or step three, are insufficient to support a claim of error in the ALJ's analysis of her mental impairments.

Plaintiff's step three claimed error regarding listing 1.04 which addresses disorders of the spine (Doc. 11 at 9-11) is similarly unavailing in that Plaintiff claims she has an inability to ambulate effectively and quotes relevant material (*id.* at 9) but does not show how she satisfies the definition of that term as defined for purposes the Act.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b.  As set out by Defendant, Plaintiff failed to establish the presence of all listing criteria set out in 20 C.F.R. pt. 404, subpt. P, appendix 1, § 1.04A-C.  (Doc. 12 at 21-22.)  For these reasons, Plaintiff has not shown that the ALJ erred in her step three determination.

Though not listed as a formal statement of error, in the Argument section of her brief, Plaintiff states that the ALJ also

erred by failing to give controlling weight to her treating physicians. (Doc. 11 at 12.)   Plaintiff cites relevant considerations regarding the deference due treating physicians' opinions. (*Id.* at 12-13.)   She then states that "[t]he ALJ erred in evaluating the treatment provided by Drs. Patel, Oleski, Sebastianelli and van der Sluis.   The Judge wrote that little weight was given to their opinions, in part because they were not supported by other tests and notes, such as a lack of neurological deficits." (*Id.* at 13 (citing R. 29).)   In this section of her brief, Plaintiff provides this single citation to the ALJ's decision but provides no citation to record evidence supporting the broad statements regarding this claimed error. (*See* Doc. 11 at 13-15.)   Furthermore, the broad construction of the argument presented by Plaintiff does not directly refute the specific reasons cited by ALJ Wolfe for discounting opinions provided. (*See id.*)

The record set out above shows that Plaintiff was treated from the time of her accident in September 2011 to early 2014 for pain which she claimed to be severe and not relieved by treatments or medication.   The ALJ thoroughly reviewed the evidence, explained why she found Plaintiff's statements concerning the limiting effects of her symptoms not entirely credible, provided specific explanations regarding the opinions of record, and limited Plaintiff to simple, routine tasks to accommodate her headache and pain complaints. (R. 19-30.)   In the face of this careful RFC

40

analysis, Plaintiff must do more than has been done here to show the ALJ erred on the treating physician basis alleged.

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal is properly denied.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: January 6, 2017

41